RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0147p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

P.I. & I. MOTOR EXPRESS, INC.,
    *Plaintiff-Appellee/Cross-Appellant*,

  *v.*

RLI INSURANCE COMPANY,
    *Defendant-Appellant/Cross-Appellee*.

Nos. 21-3412/3442

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Youngstown.
No. 4:19-cv-01008—Benita Y. Pearson, District Judge.

Argued:  December 8, 2021

Decided and Filed:  July 6, 2022

Before:  SUHRHEINRICH, STRANCH, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Todd S. Schenk, TRESSLER LLP, Chicago, Illinois, for Appellant/Cross-Appellee.
Amanda M. Leffler, BROUSE MCDOWELL LPA, Akron, Ohio, for Appellee/Cross-Appellant.
**ON BRIEF:**  Todd S. Schenk, Thomas D. Donofrio, TRESSLER LLP, Chicago, Illinois,
Richard M. Garner, COLLINS ROCHE UTLEY & GARNER LLC, Columbus, Ohio, for
Appellant/Cross-Appellee.  Amanda M. Leffler, P. Wesley Lambert, Matthew G. Vansuch,
BROUSE MCDOWELL LPA, Akron, Ohio, for Appellee/Cross-Appellant.

─────────────────

## OPINION

─────────────────

MURPHY, Circuit Judge.  Insurers routinely provide businesses with commercial general
liability policies to reimburse them for liabilities resulting from accidents (such as a grocery-
store customer slipping on a negligently maintained wet floor).  *See* 9A Steven Plitt et al., *Couch*

*on Insurance* §§ 129:1–:3 (3d ed.), Westlaw (database updated June 2022).  But these policies are not substitutes for workers' compensation insurance.  They thus typically exclude liabilities arising from a workers' compensation law or from an injury to an employee.  *See id.* § 129:11.  The liability at issue in this case sits in the unclear middle between the two types of insurance.

After a truck driver suffered an injury, a state agency found that P.I. & I. Motor Express ("Motor Express") was the driver's "statutory" employer (a unique workers' compensation concept).  But Motor Express had not obtained workers' compensation coverage for this truck driver, so the driver could sue Motor Express in tort.  Motor Express settled his tort suit.  It then sought to recover most of the settlement amount from RLI Insurance Company, which had issued it a commercial general liability policy.  RLI refused to pay on the ground that Motor Express sought workers' compensation coverage.  The district court concluded that the policy could cover Motor Express's claim, and a jury found for the company.  We must decide two questions about the policy's language: Did the tort settlement arise "under" a workers' compensation law?  And was the driver a Motor Express "employee" within the meaning of the policy?  Ultimately, we agree with the district court's interpretation of the policy and reject RLI's other challenges to the court's trial management.  We thus affirm.

I

On June 27, 2014, Ryan Marshall was seriously injured while working as a truck driver at a plant in Duquesne, Pennsylvania.  Marshall had stepped out of his flatbed truck when others were loading large metal pipes onto it.  A worker accidentally ran a forklift into the pipes, causing one of them to dislodge and roll off the truck.  The pipe crashed into Marshall as it fell.  Doctors unfortunately had to amputate both of Marshall's legs, leaving him totally disabled.

This insurance case stems from a factual dispute over who (if anyone) employed Marshall.  Three potential employers exist.  The first is Dura-Bond Industries, the owner of the Duquesne plant.  At this large facility, Dura-Bond coats pipes with corrosion-resistant materials and stores the finished pipes until its oil-and-gas customers need them in their energy businesses.  To transfer pipes between locations within the plant, Dura-Bond relies on flatbed trucks like the

one Marshall was driving. Yet Dura-Bond does not own most of the trucks; the company finds it cost-effective to use trucks owned and operated by others.

This trucking operation leads to Marshall's second potential employer: Motor Express, the plaintiff. A family-owned Ohio company founded in 1951, Motor Express has federal licenses to conduct a motor-carrier business between and within many states. It primarily hauls metal building materials for automotive and steel companies. Motor Express must ensure that any truck using its license (listing its name and license number on the door) meets federal safety regulations. It also must ensure that any driver of a licensed truck passes, among other things, a background check and drug test.

Motor Express hauls loads using different business models. For over half of its business, it relies on truckers employed by a corporate affiliate who drive trucks owned by another affiliate. For the rest, Motor Express relies on independent fleet operators or owner-operators. Fleet operators own several trucks, whereas owner-operators drive their own trucks. Motor Express enters into truck-specific contracts with these independent parties, allowing them to use its license and receive its administrative services for each truck in exchange for a percentage of the truck's revenue.

Motor Express came to do business at the Dura-Bond plant through its affiliation with a fleet operator—Wallace Trucking. Wallace Trucking's owner, Robert Wallace, had long provided trucking services at the plant and continued to do so after contracting with Motor Express. Given the volatile nature of the energy industry, though, Wallace Trucking sometimes could not meet all of Dura-Bond's trucking needs.

This fact leads to Marshall's third potential employer: Sam Russell Trucking. Technically, Sam Russell Trucking is not a distinct corporation; it is a trade name for a family business run by Sam Russell and his wife, Mary Russell. Robert Wallace knew Sam Russell and would ask him for help at the Dura-Bond plant when things got too busy. Like Wallace Trucking, Sam Russell Trucking had contracted with Motor Express to use its license. Motor Express would ensure that the drivers of Russell trucks met the basic federal requirements, but the Russells could otherwise retain the drivers they wanted.

That fact brings us back to Marshall, the injured driver. By December 2013, Marshall had spent decades on the road as a long-distance truck driver and wanted to spend more time with his family. He took a job with Dura-Bond loading and unloading pipes at its plant. While working there, Marshall noticed the trucks driving around. In April 2014, he approached Sam Russell about driving a truck. Russell told Marshall that he hired through Motor Express and had Marshall fill out a Motor Express application. After Marshall passed a background check, he spent two weeks training with Russell.

In May, Marshall leased a truck from Russell and started driving it under Motor Express's license. Although he signed a contract stating that he was an independent contractor, Marshall believed that he was an employee of both Motor Express and Sam Russell Trucking. On the night before each potential shift, Marshall would call Mary Russell to see if there would be work for him in the morning. Sam Russell or Dura-Bond employees directed Marshall's efforts while at the plant.

After Marshall's June accident, he filed a workers' compensation claim in Pennsylvania. Sam Russell Trucking, Motor Express, and Dura-Bond all became involved in the agency proceedings. Each party disclaimed an employment relationship with Marshall. For his part, Marshall conceded that he had agreed to obtain his own workers' compensation insurance and had failed to do so.

An administrative judge nevertheless found that Sam Russell Trucking had been Marshall's "immediate employer." Pa. Op., R.58-2, PageID 975. The judge also found that Motor Express and Dura-Bond had been Marshall's "statutory employers" under Pennsylvania's workers' compensation statute. *Id.* A statutory employer "is a master who is not a contractual or common-law one, but is made one by" unique provisions in the statute. *Peck v. Del. Cnty. Bd. of Prison Inspectors*, 814 A.2d 185, 187–88 (Pa. 2002) (plurality opinion) (citation omitted). Ordinary employers generally must obtain workers' compensation insurance, and statutory employers must do so if the ordinary employers do not. *See* 77 Pa. Stat. & Cons. Stat. Ann. §§ 461, 501(a)(1). Yet neither Motor Express nor Russell had insurance for Marshall. The judge thus ordered Dura-Bond (which had this insurance) to pay Marshall's benefits and allowed it to

seek indemnity from Motor Express and Russell.  An agency appeal board affirmed this decision in relevant part.  Motor Express later reimbursed Dura-Bond for these benefits.

Typically, employees covered by the Pennsylvania workers' compensation statute may seek relief only through that statute's remedial scheme and cannot bring a separate tort suit against their ordinary or statutory employers.  *See id.* § 481(a).  If, however, an employer fails to obtain workers' compensation insurance for an employee, the employer loses this immunity and may be held liable to the employee in a common-law suit.  *See id.* § 501(d); *Bowman v. Sunoco, Inc.*, 65 A.3d 901, 908 (Pa. 2013).  Marshall thus brought tort claims against Motor Express and Russell (among others) in a Pennsylvania state court.

His suit leads to this separate case's defendant: RLI.  RLI had issued Motor Express a commercial general liability policy covering bodily injuries to those harmed by the company's operations.  RLI had not, by contrast, issued Motor Express a workers' compensation policy that would cover bodily injuries to employees.  Motor Express asked RLI to defend it in Marshall's tort suit.  RLI agreed under a reservation of rights.  Ultimately, the parties settled that suit for $2.4 million.  Motor Express then asked RLI to reimburse it for the settlement.  RLI refused.

Motor Express sued RLI seeking indemnification for the settlement up to the insurance policy's $2-million limit.  Motor Express, by contrast, did not request reimbursement for the amounts that it paid Dura-Bond to cover Marshall's workers' compensation benefits.  RLI moved for summary judgment on the ground that two policy exclusions barred coverage for the tort-suit settlement.  RLI first relied on an exclusion for "[a]ny obligation" "under a workers' compensation" "law."  Ins. Pol'y, R.58-6, PageID 1112.  The district court held that this provision did not apply.  *P.I. & I. Motor Express, Inc. v. RLI Ins. Co.*, 499 F. Supp. 3d 486, 500–01 (N.D. Ohio 2020).  RLI next relied on an exclusion for injuries to an "employee"—a word defined to exclude a "temporary worker."  Ins. Pol'y, R.58-6, PageID 1112, 1124.  The court found that a dispute of fact existed over whether Marshall qualified as a Motor Express "employee" under the policy.  *See P.I. & I.*, 499 F. Supp. 3d at 501–05.  And even if Marshall otherwise were an employee, the court also found that a dispute of fact existed over whether he was the type of "temporary worker" that the policy carved out from the "employee" definition.  *See id.*

The case proceeded to trial on these "employee" questions. A jury found that Marshall was a "temporary worker," leaving the tort-suit settlement covered by the policy. The jury awarded Motor Express $2 million, and the court entered a final judgment for that amount.

II

On appeal, RLI raises two legal arguments about the meaning of its policy. It agreed to reimburse Motor Express for liabilities resulting from a "bodily injury" "caused by an 'occurrence'"—a word defined to mean "accident." Ins. Pol'y, R.58-6, PageID 1111, 1125. An accident undisputedly caused Marshall's injuries. But the policy goes on to list many exclusions from otherwise-covered injuries. As in the district court, RLI invokes what we will call the "workers' compensation" and "employer" exclusions.

A. Workers' Compensation Exclusion

Under an exclusion entitled "Workers' Compensation And Similar Laws," RLI's policy provides that "[t]his insurance does not apply to": "Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law." *Id.*, PageID 1112. The parties agree that this text prohibits Motor Express from seeking reimbursement for Marshall's workers' compensation benefits. We need only consider whether it covers Motor Express's separate $2.4-million settlement of Marshall's tort suit. The parties also agree that the tort settlement qualified as an "obligation" of the "insured." This case thus turns on the question whether this settlement "obligation" was "under" Pennsylvania's "workers' compensation" "law."

It was not. Both parties cite Ohio cases to interpret RLI's policy, so we may simply assume that Ohio contract law applies. *Cf. Masco Corp. v. Wojcik*, 795 F. App'x 424, 427 (6th Cir. 2019). That law directs us to interpret the words in the policy according to their ordinary, everyday meaning. *See Wilkerson v. Am. Fam. Ins. Co.*, 997 F.3d 666, 669 (6th Cir. 2021) (citing *Ohio N. Univ. v. Charles Constr. Servs., Inc.*, 120 N.E.3d 762, 766 (Ohio 2018); *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995)). If, moreover, the words are unambiguous, we must apply the policy as written and cannot resort to outside-the-contract evidence to interpret it. *See Guman*, 652 N.E.2d at 686.

We thus start by asking how the average policyholder would understand the phrase "obligation . . . under a workers' compensation . . . law." Ins. Pol'y, R.58-6, PageID 1112. The key word—under—has nearly a page's worth of dictionary definitions. *See Webster's New International Dictionary of the English Language* 2765–66 (2d ed. 1934). Thus, as the U.S. Supreme Court has repeatedly recognized when interpreting statutes that include the word, we must look to the specific context in which this linguistic "chameleon" is used to identify its meaning. *Kucana v. Holder*, 558 U.S. 233, 245 (2010); *see, e.g.*, *Pereira v. Sessions*, 138 S. Ct. 2105, 2117 (2018); *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 630 (2018); *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 39–41 (2008).

In RLI's policy, this preposition connects an obligation to a law. When used in this way, the word most naturally conveys that the obligation arises "'pursuant to' or 'by reason of the authority of'" the law. *Nat'l Ass'n of Mfrs.*, 138 S. Ct. at 630 (quoting *St. Louis Fuel & Supply Co. v. FERC*, 890 F.2d 446, 450 (D.C. Cir. 1989) (R.B. Ginsburg, J.)); *see In re Hechinger Inv. Co. of Del.*, 335 F.3d 243, 252 (3d Cir. 2003) (Alito, J.). That is, the obligation must exist "because of" the law or, stated the other way, the law must be the source of the obligation. *Webster's*, *supra*, at 2765. If, for example, someone says that a federal agency enacted a regulatory requirement "under" a statute, the person is conveying that the statute is what gave the agency the authority to enact the requirement. *See Nat'l Ass'n of Mfrs.*, 138 S. Ct. at 630. Or if someone says that the plaintiff filed a claim "'under' 42 U.S.C. § 1983," the person is conveying that § 1983 is what gave the plaintiff the right to bring this claim. *See Hechinger*, 335 F.3d at 252.

This reading poses a problem for RLI. The $2.4-million settlement arose from a suit that Marshall brought against Motor Express under Pennsylvania's common law of torts. So the commonwealth's judge-made *tort law*—not its statutory *workers' compensation law*—is what gave Marshall the ability to seek this money (and what gave Motor Express the duty to pay it). The workers' compensation statute, if anything, went a long way toward *eliminating* this common-law duty. The statute generally bars employees from filing tort suits against statutory employers that have workers' compensation insurance. 77 Pa. Stat. & Cons. Stat. Ann. § 481(a); *see Fonner v. Shandon, Inc.*, 724 A.2d 903, 905–07 (Pa. 1999). And while Motor Express failed

to obtain this insurance, its failure merely eliminated what would have otherwise been its statutory immunity from the tort suit. *See* 77 Pa. Stat. & Cons. Stat. Ann. § 501(d); *Bowman*, 65 A.3d at 908. But the absence of this immunity does not change the fact that Marshall brought his suit pursuant to the common law of torts, not "a workers' compensation . . . law." Ins. Pol'y, R.58-6, PageID 1112.

To be sure, the word "under" can also mean "[i]n accordance or conformity with." *Webster's*, *supra*, at 2765; *Pereira*, 138 S. Ct. at 2117. And RLI argues that Marshall's tort suit was "in conformity with" the workers' compensation statute because the statute permitted Marshall to seek this relief in light of Motor Express's lack of insurance. But this reading proves too much. For example, it is obvious that the workers' compensation statute also permits customers (who are not employees) to bring tort suits against businesses for injuries suffered on their premises. Because a customer's suit would be in "conformity" with the workers' compensation statute (since the statute would not prohibit the suit), would the suit fall within the workers' compensation exception too? That view would leave RLI's policy with nothing to cover.

An analogy reinforces this interpretation. The U.S. Constitution grants the states sovereign immunity from damages suits, but Congress can sometimes abrogate this immunity. *Compare Tennessee v. Lane*, 541 U.S. 509, 530–34 (2004), *with Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 91–92 (2000). The Americans with Disabilities Act, for instance, permits the disabled to seek damages from a state if it violates the Act's provisions regulating public services. *Lane*, 541 U.S. at 516–17. The U.S. Supreme Court has held that the Constitution permits this waiver of immunity. *Id.* at 530–34. Yet an ordinary person would not describe a disabled individual's damages suit as "under" the Constitution merely because the suit was in conformity with the Constitution. Rather, the person would say that the individual sued "under" the Act—the suit's source of authority. In the same way, Marshall's suit was "under" the common law. The suit was not "under" the workers' compensation statute merely because the statute permitted the common-law suit.

Nevertheless, we may assume that this exclusion might be ambiguous if read by itself. Ohio law would then require us to ask whether one reading of the exclusion best fits the contract

"as a whole" before conclusively finding it ambiguous. *See Sauer v. Crews*, 18 N.E.3d 410, 413 (Ohio 2014). And here, our narrower reading of "under" makes more sense when the exclusion is read against the entire insurance policy. As the district court persuasively explained, *see P.I. & I.*, 499 F. Supp. 3d at 500–01, a different part of the policy shows that RLI knows how to exclude a tort liability that gets triggered by an insured's failure to comply with a workers' compensation law. The policy includes "stop-gap" coverage for certain types of Ohio claims. Ins. Pol'y, R.58-6, PageID 1130–33; *see generally* 3 Pat Magarick & Ken Brownlee, *Casualty Insurance Claims* § 40:7 (4th ed.), Westlaw (database updated Nov. 2021). This otherwise irrelevant Ohio coverage contains an identical exclusion for an "obligation" "under" a "workers' compensation" "law." Ins. Pol'y, R.58-6, PageID 1131. Critically, though, it also contains an additional exclusion entitled "Failure to Comply With 'Workers' Compensation Law.'" *Id.* This separate exclusion disqualifies from coverage an insured's tort liability if the insured's "failure to secure [its] obligations or other failure to comply with any 'workers' compensation law'" "[d]eprived" the insured of "common law defenses" or subjected the insured to a "penalty[.]" *Id.*

This separate exclusion has great significance here. If, as RLI claims, the workers' compensation exclusion *already* prohibits coverage for a common-law liability that arises from the failure to comply with a workers' compensation law, the separate exclusion serves no purpose. But when an ambiguous contract term can be read in two ways, one of which will render another term "meaningless" and the other of which will give it "meaning and purpose," Ohio courts prefer the latter interpretation. *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 295 (Ohio 2011); *Wilkerson*, 997 F.3d at 671. This interpretive guidepost means that we should stick with our narrower reading of "under" because it gives both exclusions effect. Notably, moreover, RLI's policy contains this separate exclusion—the one covering an insured's failure to comply with a workers' compensation law—*only* in the Ohio-specific stop-gap coverage. It thus cannot bar coverage for Motor Express's failure to comply with Pennsylvania law in this case.

In response, RLI does not rely on the policy's text; it jumps straight to precedent. We admit that some courts have read similar workers' compensation exclusions as RLI would have us read its exclusion. As the Kentucky Supreme Court noted, "[e]very jurisdiction that has

considered this issue has held that a 'workers' compensation' exclusion" in this type of policy "precludes coverage when the insured employer is exposed to tort liability solely because of its failure to procure a policy of workers' compensation insurance." *Brown v. Ind. Ins. Co.*, 184 S.W.3d 528, 534–35 (Ky. 2005) (collecting cases). RLI identifies four Ohio cases that it suggests follow this rule. *See Crum & Forster Indem. Co. v. Ameritemps, Inc.*, 976 N.E.2d 957, 961–62 (Ohio Ct. App. 2012); *Sharp v. Thompson*, 2008 WL 4382678, at *3 (Ohio Ct. App. Sept. 25, 2008); *Scott v. Levans*, 2000 WL 1643518, at *1–2 (Ohio Ct. App. Nov. 3, 2000); *Westfield Ins. Co. v. Malvern Wood Prods., Inc.*, 1994 WL 501762, at *4 (Ohio Ct. App. Sept. 12, 1994).

But these cases are all distinguishable for a simple reason: none of them so much as hinted that the relevant policies included a separate exclusion for tort liabilities arising from an insured's failure to comply with a workers' compensation law. So these courts did not have to worry about whether their broader reading would leave another exclusion superfluous. Here, by contrast, we must attempt to avoid this superfluity problem. *See Sunoco*, 953 N.E.2d at 295. And RLI has only a weak response to it. RLI points out that this separate exclusion applies only to the Ohio stop-gap coverage that is not at issue here. Yet Ohio courts generally presume that identical contract language means the same thing across the whole contract. *See Wells Fargo Bank, N.A. v. Allstate Ins. Co.*, 784 F. App'x 401, 404–05 (6th Cir. 2019); *see also Penn Traffic Co. v. AIU Ins. Co.*, 790 N.E.2d 1199, 1204 (Ohio 2003). Because we must interpret the workers' compensation exclusion narrowly in the stop-gap coverage to give effect to the separate exclusion, we should give the same workers' compensation exclusion this narrower reading wherever we find it in the policy. For this reason, we need not decide whether we would have disagreed with the cases that RLI cites. None of them considered a contract like the one before us.

The four Ohio cases do not help RLI for an additional reason. The policy in three of the cases contained a broader exclusion. It barred coverage for "any obligation for which the 'insured' . . . *may* be held liable under any workers' compensation . . . law[.]" *Ameritemps*, 976 N.E.2d at 959 (emphasis added); *Scott*, 2000 WL 1643518, at *1; *Malvern*, 1994 WL 501762, at *4. One could read this text to reach conduct that *may* have arisen under a workers'

compensation law—even if a worker sued in tort. Here, by contrast, the exclusion covers only obligations that *actually* arise "under" a workers' compensation law. Ins. Pol'y, R.58-6, PageID 1112. As for the fourth Ohio case, it did not address the issue that we face. The employer argued only that the injured worker raised an intentional-tort claim, which would have removed the claim from the workers' compensation exclusion under then-controlling precedent. *Sharp*, 2008 WL 4382678, at *3–4. *Sharp* held that the employee's complaint did not plead such a claim; it said nothing about the coverage that applies if an employer does not buy workers' compensation insurance. *See id.*

Lastly, some of RLI's cited decisions invoke policy concerns. No matter the contract language, they reason, courts should deny coverage in this setting to incentivize employers to buy workers' compensation insurance and to ensure that employers are not "rewarded" for failing to do so. *Brown*, 184 S.W.3d at 535 (citation omitted). But the Ohio Supreme Court determines a contract's meaning by looking to the parties' intent, not external policy considerations. *See Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003); *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Co.*, 714 N.E.2d 898, 900–01 (Ohio 1999). And when a contract contains clear text, this text conclusively establishes that intent. *See Galatis*, 797 N.E.2d at 1261.

In that respect, perhaps RLI *subjectively* meant to exclude a claim like Motor Express's because, as it sees things, its commercial general liability policy is not a workers' compensation policy and should not cover anything related to workers' compensation. We must respond to this argument the same way that the Ohio Supreme Court responded when a policyholder asserted that it subjectively meant for coverage to apply: "this is an argument" for RLI's policy drafters, who need only write a broader exclusion. *Ward v. United Foundries, Inc.*, 951 N.E.2d 770, 774–75 (Ohio 2011). But the exclusion that RLI did write—when read against its policy as a whole—does not cover an obligation whose source is the common law of torts, not a workers' compensation statute. The exclusion thus does not apply to Motor Express's tort-suit settlement.

B. Employer Exclusion

Under an exclusion entitled "Employer's Liability," RLI's policy next bars coverage for "'[b]odily injury' to: (1) An 'employee' of the insured arising out of and in the course of: (a) Employment by the insured; or (b) Performing duties related to the conduct of the insured's business[.]" Ins. Pol'y, R.58-6, PageID 1112. The policy indicates that the word "employee" includes a "leased worker" and excludes a "temporary worker." *Id.*, PageID 1124. But it does not contain a general definition of the word "employee."

The parties begin by debating the proper meaning of this word. According to RLI, we should define "employee" in the policy to include "statutory" employees under a workers' compensation scheme like Pennsylvania's. The "statutory employer" concept expands the number of entities that qualify as "employers" beyond the traditional "common-law" definition. *McDonald v. Levinson Steel Co.*, 153 A. 424, 425 (Pa. 1930); *see Six L's Packing Co. v. Workers' Comp. Appeal Bd. (Williamson)*, 44 A.3d 1148, 1150 (Pa. 2012). It does so to ensure that an injured worker can receive benefits from a solvent party (typically, a general contractor) if the common-law employer (typically, a subcontractor) lacks workers' compensation coverage. *Peck*, 814 A.2d at 187–88 (plurality opinion) (citation omitted); 77 Pa. Stat. & Cons. Stat. Ann. §§ 461–62. Because the relevant Pennsylvania agency found Motor Express to be Marshall's "statutory employer," RLI's argument goes, Marshall was an employee under the policy. *Cf. Amerisure Ins. Co. v. Orange & Blue Constr., Inc.*, 545 F. App'x 851, 854–55 (11th Cir. 2013).

According to Motor Express, we should define the word "employee" in RLI's policy to adopt the word's narrower common-law definition—one that asks whether a purported employer has the right to "control" a purported employee's work. Motor Express notes that the Ohio Supreme Court has already interpreted the undefined word "employee" in another policy to incorporate this common-law control test. *See Guman*, 652 N.E.2d at 686–87. And because the Pennsylvania agency found that Motor Express was Marshall's statutory employer (not its regular employer), Motor Express reasons that the exclusion does not apply. *Cf. Va. Elec. & Power Co. v. Northbrook Prop. & Cas. Ins. Co.*, 475 S.E.2d 264, 270–71 (Va. 1996). Indeed, in a separate cross-appeal, Motor Express suggests that it is entitled to judgment as a matter of law on this issue.

We need not resolve this debate because the jury found that Marshall did not qualify as an employee on a different ground. Even if Marshall might otherwise have been a Motor Express "employee" under the applicable definition, the policy specifically excludes "temporary worker[s]" from this definition. Ins. Pol'y, R.58-6, PageID 1124. It defines "temporary worker" to mean "a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions." *Id.*, PageID 1127. And Motor Express argued that Marshall had been "furnished to" it by Sam Russell Trucking to meet Dura-Bond's "short-term workload" needs when Wallace Trucking could not handle them. *Id.* The jury agreed. Its temporary-worker finding took Marshall outside the employer exclusion. After the jury's verdict, moreover, RLI failed to move for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). That failure bars us from considering any challenge to the sufficiency of the evidence underlying the jury's finding. *See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 400–06 (2006); *Ayers v. City of Cleveland*, 773 F.3d 161, 168 (6th Cir. 2014).

RLI responds that it raised two "purely legal" claims against the use of this temporary-worker provision at the summary-judgment stage. *In re AmTrust Fin. Corp.*, 694 F.3d 741, 750 (6th Cir. 2012). And our cases permit us to consider these legal claims even though RLI did not renew them in a Rule 50(b) motion. *See id.* at 750–51 (distinguishing *Ortiz v. Jordan*, 562 U.S. 180, 188–92 (2011)); *cf. Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 974 F.3d 767, 785 & n.10 (6th Cir. 2020). RLI makes a preclusion argument (about the effect of the Pennsylvania agency's decision) and a purpose argument (about the reason for the temporary-worker provision).

*Preclusion Argument*. RLI first says that the Pennsylvania agency's finding that Marshall was a "statutory employee" under the Pennsylvania workers' compensation statute legally precludes a finding that he was a "temporary worker" under its policy. This argument implicates a "bewildering" choice-of-law issue. 18B Charles A. Wright et al., *Federal Practice and Procedure* § 4472, at 349 (3d ed. 2019). Because this case arises under our diversity jurisdiction, should we look to the choice-of-law rules of Ohio (the state in which the district court sits) to identify the specific state's preclusion law that applies? *Cf. Taveras v. Taveraz*, 477 F.3d 767, 783 (6th Cir. 2007); 18B Wright, *supra*, § 4472, at 354. Or should we instead rely on

federal choice-of-law rules to identify the governing preclusion law?  *Cf. Univ. of Tenn. v. Elliott*, 478 U.S. 788, 794–99 (1986); 18B Wright, *supra*, § 4472, at 354.  Thankfully, the parties do not dispute that both choice-of-law sources (Ohio and federal law) point us to the preclusion law of the same jurisdiction: Pennsylvania.  *Compare Elliott*, 478 U.S. at 799; 28 U.S.C. § 1738, *with Holzemer v. Urbanski*, 712 N.E.2d 713, 715–16 (Ohio 1999); U.S. Const. art. IV, § 1.  So we will apply that law here.

The parties also do not dispute that Pennsylvania courts would apply the commonwealth's preclusion rules to a judgment from this workers' compensation agency even where (as here) no court has reviewed this judgment.  We thus may assume that the agency's decisions are eligible for preclusive effect.  *Cf. Grant v. GAF Corp.*, 608 A.2d 1047, 1054–55 (Pa. Super. Ct. 1992); 18B Wright, *supra*, § 4471.3, at 319.   Still, RLI cannot meet Pennsylvania's test for issue preclusion.  Issue preclusion generally bars a party from relitigating an issue in a second case that the party has already litigated to a final judgment in an earlier one. *See, e.g.*, *McNeil v. Owens-Corning Fiberglas Corp.*, 680 A.2d 1145, 1147–48 (Pa. 1996).  But Pennsylvania courts would not allow a first case to preclude an issue in a second one unless both cases involved the same issue and the issue was "actually litigated" in the first case.  *Clark v. Troutman*, 502 A.2d 137, 139 (Pa. 1985); *see also Muhammad v. Strassburger, McKenna, Messer, Shilobod & Gutnick*, 587 A.2d 1346, 1348 (Pa. 1991); *Odgers v. Commonwealth*, 525 A.2d 359, 364–65 (Pa. 1987); Restatement (Second) of Judgments § 27 cmt. e (Am. L. Inst. 1982).

Here, the Pennsylvania agency concluded that Marshall was a statutory employee under the commonwealth's workers' compensation statute.  But the jury found that Marshall was a temporary worker under RLI's insurance policy.  These two issues are not "identical."  *See Odgers*, 525 A.2d at 364.  The former (workers' compensation) question required the agency to find that Motor Express was a "contractor" and that Sam Russell Trucking was a "subcontractor" within the statutory definition of those words.  *See* 77 Pa. Stat. & Cons. Stat. Ann. § 461; *cf. Six L's*, 44 A.3d at 1159.  The latter (contract-law) question required the jury to find that Russell "furnished" Marshall to Motor Express to meet "short-term workload conditions."  Ins. Pol'y, R.58-6, PageID 1127.  These questions have little in common.  Indeed, the agency's factual

findings might support the conclusion that Marshall was a temporary worker. After all, its appeal board recognized that Dura-Bond used Russell's services only when Wallace could not meet Dura-Bond's needs—that is, only on a short-term basis. Bd. Op., R.58-3, PageID 1007.

RLI responds that Motor Express could qualify as a "contractor" (and so a statutory employer) under Pennsylvania law only if it contracted with Sam Russell Trucking "to have work performed of a kind which is a *regular or recurrent* part of the business[.]" 77 Pa. Stat. & Cons. Stat. Ann. § 461 (emphasis added). The agency's conclusion that this element was met, RLI's argument goes, conflicts with the temporary-worker requirement that a worker be furnished to meet only "*short-term* workload conditions." Ins. Pol'y, R.58-6, PageID 1127 (emphasis added). But we can easily harmonize the two definitions. The work that Sam Russell Trucking performed—trucking operations—was of a "kind" that was a "regular" (indeed, the main) part of Motor Express's business. But nothing in this conclusion required that Marshall *himself* be regularly engaged in business for Dura-Bond. The mere fact that Motor Express was in the trucking business says nothing about the possibility that it used temporary workers to drive trucks when its primary subcontractor (Wallace Trucking) could not meet Dura-Bond's needs.

*Purpose Argument*. RLI next argues that Marshall should not qualify as a temporary worker because that finding would undercut the purpose behind this provision. The workers' compensation laws in some states distinguish between leased workers (who become employees of the entities to whom they are leased) and temporary workers (who remain the employees of temporary staffing agencies). *See Gen. Agents Ins. Co. of Am., Inc. v. Mandrill Corp.*, 243 F. App'x 961, 967 (6th Cir. 2007) (opinion of Kennedy, J.); *Brown*, 184 S.W.3d at 537–38. Because temporary workers do not become the employees of the entities to whom they are assigned, the workers' compensation laws do not immunize the entities from a worker's tort suit. Given that the workers' compensation laws do not apply, the temporary-worker provision allows the liability insurance to kick in. *See Mandrill*, 243 F. App'x at 967 (opinion of Kennedy, J.). This "coverage gap" purpose has no application here. Pennsylvania's scheme does not distinguish between leased employees and temporary workers. And Motor Express was Marshall's "statutory employer," so Pennsylvania would have granted it tort immunity had it obtained the required insurance. *See* 77 Pa. Stat. & Cons. Stat. Ann. § 481(a). Because the facts

of this case do not implicate any "gap" in coverage, RLI asks us to set aside the temporary-worker provision.

Its purpose argument flouts Ohio contract law. Under well-settled rules, a contract's meaning hinges on the words that the parties put into the contract. *See Galatis*, 797 N.E.2d at 1261; *see also Sunoco*, 953 N.E.2d at 292; *Shifrin v. Forest City Enters., Inc.*, 597 N.E.2d 499, 501 (Ohio 1992). And RLI opted to put the temporary-worker definition into this policy—a definition that does not turn on whether a particular state's laws draw a distinction between leased employees and temporary workers. We have no power to jettison the contract's expressed definition by looking to RLI's unexpressed hopes behind it. As with the workers' compensation exclusion, RLI may change this definition if the provision does not meet RLI's subjective expectations. *See Ward*, 951 N.E.2d at 774–75. Until the insurer does so, however, courts must apply the policy language as written. They cannot simply ignore it, as RLI would have us do.

III

Apart from its two legal arguments, RLI challenges the district court's handling of the trial. It claims that the court improperly instructed the jury. And it contends that the court wrongly excluded evidence. Neither claim has merit.

A. Jury Instructions

RLI initially takes issue with the district court's jury instructions. In a diversity case like this one, a state's substantive law governs whether a particular instruction misstated the governing legal principles. *See Frye v. CSX Transp., Inc.*, 933 F.3d 591, 600 (6th Cir. 2019). And we review the question whether the district court's instructions accurately conveyed Ohio contract law de novo. *See Smith v. Joy Techs., Inc.*, 828 F.3d 391, 397 (6th Cir. 2016). At the same time, federal procedural law governs whether a substantive state-law error in an instruction warrants reversal for a new trial. *See Frye*, 933 F.3d at 600. And we will reverse a judgment based on a legally mistaken instruction only if the instruction prejudiced a party when considered against the instructions as a whole. *See Joy Techs.*, 828 F.3d at 397. RLI challenges three instructions: an instruction on ambiguity in contracts; an instruction on the burden of proof; and an instruction on the definitions of "employee" and "temporary worker."

*Ambiguity*. RLI first objects to the district court's instructions about how to resolve an ambiguity in a contract. The court told the jury that it "may" have to determine the meaning of some of the policy's terms. Tr., R.165, PageID 7094. It went on to describe Ohio's rules for interpreting contracts, including, for example, that an interpreter must give contract language its ordinary meaning. *Id.* The court then noted: "Because insurance companies write the insurance policies, . . . the law requires that any ambiguities in the insurance policies must be construed against them, RLI Insurance Company, and in favor of the policyholder, P.I. & I. Motor Express." *Id.*, PageID 7095. This proposition correctly stated Ohio law, which requires ambiguities in a contract to be resolved against insurers. *See, e.g.*, *Galatis*, 797 N.E.2d at 1262. But RLI points out that Ohio law requires *courts*—not *juries*—to decide whether a contract is ambiguous before allowing a factfinder to resolve any ambiguity. *See, e.g.*, *Guman*, 652 N.E.2d at 686; *Potti v. Duramed Pharms., Inc.*, 938 F.2d 641, 647 (6th Cir. 1991). And the court's instructions here did not identify any term that it found ambiguous. RLI thus argues that the court wrongly implied that the jury should resolve whether the policy was ambiguous.

RLI's implication is a fair one. Yet it is not uncommon for courts to mistakenly give legal questions to juries given the subtle distinctions that sometimes separate legal questions from factual (or mixed) ones. In the context of constitutional claims under 42 U.S.C. § 1983, for example, district courts have sometimes wrongly asked juries to resolve constitutional or qualified-immunity questions that the courts themselves should have decided. *See, e.g.*, *Gerics v. Trevino*, 974 F.3d 798, 803–06 (6th Cir. 2020); *Young v. Bd. of Supervisors of Humphreys Cnty.*, 927 F.3d 898, 904 (5th Cir. 2019); *Gonzales v. Duran*, 590 F.3d 855, 859–62 (10th Cir. 2009); *Ansley v. Heinrich*, 925 F.2d 1339, 1347–48 (11th Cir. 1991). But that does not mean that appellate courts must require a new trial in all these instances. Rather, courts have often held that instructing the jury to make a legal conclusion was "harmless" error. *See, e.g.*, *Gonzales*, 590 F.3d at 862.

That is the case here. We have already recognized that an instruction can be harmless when it wrongly tells a jury that the jury itself may decide whether a contract is ambiguous. *See Bar's Prods. Inc. v. Bars Prods. Int'l Inc.*, 662 F. App'x 400, 407 (6th Cir. 2016); *see also Johnston v. Companion Prop. & Cas. Ins. Co.*, 318 F. App'x 861, 864–65 (11th Cir. 2009). Yet

RLI spends all of one sentence on why the instruction prejudiced it. RLI calls the instruction "problematic" because the court read it just before instructing the jury on the employer exclusion's terms. Appellant's Br. 27. This is the type of "speculation" that falls short of showing prejudice. *Gonzales*, 590 F.3d at 862. RLI identifies no way in which this legal error could have made it more likely that the jury found Marshall to be a temporary worker. RLI does not suggest, for example, that the instruction might have led the jury to adopt a legally mistaken interpretation of the temporary-worker definition. Nor does it suggest that the district court's later instructions implied that this temporary-worker definition was ambiguous. *Cf. Johnston*, 318 F. App'x at 865. So any error was harmless. *See Joy Techs.*, 828 F.3d at 397.

*Burden of Proof*. RLI next objects to the court's instruction describing the parties' burdens of proof. The Ohio Supreme Court treats an "exclusion" to an insurance policy's coverage as an affirmative defense, so the insurer—not the insured—bears the burden to prove that the exclusion "specifically applies." *Neal-Pettit v. Lahman*, 928 N.E.2d 421, 424 (Ohio 2010) (citing *Cont'l Ins. Co. v. Louis Marx & Co.*, 415 N.E.2d 315, 317 (Ohio 1980)); *see also* 17A Steven Plitt et al., *Couch on Insurance* § 254:12 (3d ed.), Westlaw (database updated June 2022). The district court thus instructed the jury: "The burden of proof is on RLI to prove, by a preponderance of the evidence, that the Employer's Liability exclusion specifically applies." Tr., R.165, PageID 7093. RLI cannot dispute that this instruction correctly stated Ohio law.

RLI nevertheless asserts that the court wrongly refused to give a follow-on instruction. Some Ohio cases have held that the burden of proof shifts back to the insured if it argues that its request for coverage falls within an "exception" to a policy "exclusion." *See Goodrich Corp. v. Com. Gen. Union Ins. Co.*, 2008 WL 2581579, at \*21 (Ohio Ct. App. June 30, 2008); *U.S. Indus., Inc. v. Ins. Co. of N. Am.*, 674 N.E.2d 414, 417 (Ohio Ct. App. 1996) (per curiam); *Plasticolors, Inc. v. Cincinnati Ins. Co.*, 620 N.E.2d 856, 858 (Ohio Ct. App. 1992); *cf.* 17A Plitt, *supra*, § 254:13. And RLI claims that the temporary-worker carveout from the definition of employee qualifies as an "exception" to the employer "exclusion." It says that the court should have told the jury that Motor Express bore the burden to prove that Marshall was a temporary worker.

Even if the Ohio Supreme Court would adopt this burden-shifting framework for exceptions to exclusions, that framework would not apply here. A typical policy "exception" indicates that an exclusion that would otherwise bar coverage does not apply to a given set of facts. So, for example, an exclusion might bar coverage for *any* "discharge" of "pollutants." *See U.S. Indus.*, 674 N.E.2d at 415. The policy might then go on to say that this exclusion does not apply to otherwise qualifying discharges if they are *sudden and accidental*. *Id.*

The policy provisions at issue here do not fit this structure. All agree that RLI bears the burden to prove that the "employer" exclusion applies, which requires RLI to prove that an "employee" suffered a bodily injury. Ins. Pol'y, R.58-6, PageID 1112. The policy defines "employee" to exclude temporary workers. The temporary-worker limit thus is not an exception to the "employer" exclusion; rather, it is a clarification of the exclusion's scope.

A hypothetical illustrates the point: Assume that the policy had defined the word "employee" to mean workers who meet the common-law control test. *See Guman*, 652 N.E.2d at 686–87. This definition would necessarily carve out from the employer exclusion all workers over whom a purported employer lacked sufficient control. Yet nobody would describe this lack-of-control limitation on the employee definition as an exception to the employer exclusion. But that is what RLI asks us to do for the temporary-worker limitation. It is mistaken.

*Definitions of "Employee" and "Temporary Worker."* RLI lastly objects to the district court's instructions about the definitions of "employee" and "temporary worker." When defining the word "employee," the district court made several statements about Ohio's "control" test. Tr., R.165, PageID 7095. We need not decide whether these statements accurately summarized Ohio law for the same reason that we need not decide whether RLI's policy adopted this "control" test. Even if the instructions misstated Ohio law, RLI has not shown that this error harmed it. *See Joy Techs.*, 828 F.3d at 397. Because the jury found that Marshall was a temporary worker, he would have fallen outside the employer exclusion whether the court defined the word "employee" broadly or narrowly. Its instruction could not have affected the outcome.

The district court's definition of "temporary worker" began with the policy's definition: "a person who is furnished to . . . Motor Express to meet short-term workload conditions." Tr., R.165, PageID 7097. The court then clarified the scope of the words "furnished" and "short-term." It explained that a temporary worker did not need to be "'furnished' by anyone in particular" and that "[s]hort-term working conditions may be indefinite in nature and may exist even when the employer had a regular practice of meeting its fluctuating workload with temporary workers." *Id.* RLI complains that these later statements improperly "attempted to re-write or supplement" the policy language. Appellant's Br. 29. But it has not even tried to explain why the statements misinterpreted the relevant words, so it has forfeited any claim that they were legally mistaken. *See Infinity Cap. LLC v. Francis David Corp.*, 851 F. App'x 579, 590 (6th Cir. 2021).

## B.  Exclusion of Evidence

This conclusion leaves RLI's complaint that the district court wrongly excluded three types of evidence from trial. We review a court's decision to exclude evidence for an abuse of discretion. *See Burley v. Gagacki*, 729 F.3d 610, 620 (6th Cir. 2013). And we will not reverse on this ground unless an evidentiary error affected a party's "substantial rights" by potentially changing the outcome. *See Beck v. Haik*, 377 F.3d 624, 634–35 (6th Cir. 2004), *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009) (en banc); Fed. R. Civ. P. 61; Fed. R. Evid. 103(a).

We need not consider whether the district court properly excluded RLI's first two pieces of evidence because RLI has not shown that the exclusion could have affected the outcome. RLI first sought to admit evidence that the Pennsylvania agency had found that Motor Express was Marshall's statutory employer under Pennsylvania law. It next sought to admit evidence about the definition of "employee" in a federal regulation, which broadly defines the word for purposes of motor-carrier regulations to include independent-contractor drivers. *See* 49 C.F.R. § 390.5. The court refused to allow both types of evidence because it read RLI's policy to adopt a different definition of "employee" tied to Ohio's "control" test. Yet again, we opt not to decide whether the court was correct on the merits about the meaning of "employee." The jury's finding that Marshall was a temporary worker makes the issue unnecessary to resolve. And RLI

has failed to show how the exclusion of this employee-definition evidence could have affected the jury's temporary-worker finding. To the contrary, the jury's verdict rendered the exclusion "harmless." *See CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 588 (6th Cir. 2015).

The district court next did not abuse its discretion in refusing to admit the third piece of evidence. *See Burley*, 729 F.3d at 620. RLI sought to introduce pleadings and testimony from the workers' compensation proceedings to suggest that Motor Express had inconsistently argued that Marshall had been a leased employee (rather than a temporary worker). The district court rejected this evidence on the ground that it would be unduly prejudicial. Fed. R. Evid. 403. The court had a reasonable basis for that conclusion because the evidence risked "confusing the issues" and "misleading the jury[.]" *Id.*; *cf. Jones v. Wiseman*, 838 F. App'x 942, 950 (6th Cir. 2020). To begin with, this evidence would have complicated the trial because the policy's leased-worker provision was not a part of it. RLI even conceded that it was not claiming that Marshall had been a "leased worker" under the policy. Haff Dep., R.69-6, PageID 4080. RLI also fails to give us any context for Motor Express's prior suggestion that Marshall had been a leased employee. As best we can tell, Motor Express raised the issue for an argument about a separate Pennsylvania statute, not the policy's leased-worker provision. And RLI has not shown that this statute followed the policy's leased-worker definition, so Motor Express's arguments may not even have been inconsistent (and any differences between the statute and the policy could have led to jury confusion).

\* \* \*

Whether or not RLI subjectively meant for its commercial general liability policy to cover a claim like Motor Express's in this case, the policy's language objectively covers it. So we affirm.