NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0056n.06

No. 23-3214

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Feb 06, 2024
KELLY L. STEPHENS, Clerk

| | |
|---|---|
| LAWRENCE A. LYNN, | ) |
| Plaintiff-Appellant, | ) |
| v. | ) |
| | ) |
| BECTON, DICKINSON & CO., | ) |
| Defendant-Appellee. | ) |
| | ) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

OPINION

Before: COLE, GILMAN, and LARSEN, Circuit Judges.

**RONALD LEE GILMAN, Circuit Judge.** In 1998, Dr. Lawrence Lynn and Becton, Dickinson & Co. (BD) contracted for BD to license several patents owned by Lynn. The parties amended their Patent License Agreement twice thereafter and, as relevant to this appeal, those amendments addressed the duration of the license and the amount of royalties that BD owed Lynn. Based on BD's belief that the License Agreement ended on August 12, 2019, it stopped paying royalties to Lynn after that date. But Lynn contends that royalty payments under the License Agreement extended until at least December 7, 2021, so he sued BD in federal court, alleging breach of contract and breach of the implied duty of good faith and fair dealing.

The district court granted summary judgment in favor of BD, concluding that BD's obligation to pay royalties to Lynn ended on August 12, 2019. It also concluded that Lynn had failed to establish a genuine dispute of material fact regarding the amount of royalties that BD was obligated to pay him. As a result, the court granted summary judgment to BD on all of Lynn's claims.

Lynn now appeals. He asserts that the district court erred in (1) interpreting the provision of the License Agreement governing the end date for the payment of royalties, and (2) concluding that the evidence he provided was insufficient to establish a genuine dispute of material fact as to the amount of royalties due him. Because we conclude that none of Lynn's arguments has merit, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.    The parties and their agreement

Lynn is a physician who has invented several medical devices, including a class of devices known as Blunt Cannula Penetration Medical Valves (the Valves). He owns several patents relating to the Valves, which are used to facilitate the delivery of medication to patients through an intravenous system. BD is a global technology company that develops, manufactures, and sells a variety of medical supplies and devices.

The License Agreement granted BD the exclusive right to several of Lynn's patents and patent applications, including "any continuations, continuations in part, divisions, extensions, substitutions, reissues or reexaminations thereof, and all patents issuing therefrom; and any subsequently filed patent applications, and any patents issuing therefrom owned by or assigned to Dr. Lynn which claim [the Valves]." In exchange, BD agreed to pay royalties to Lynn for sales of "Royalty Bearing Products," which the License Agreement defined as

> any Blunt Cannula Penetration Medical Valve (1) whose manufacture, use, sale, offer for sale, or importation by BD or a Sublicensee, but for this Agreement, in a jurisdiction where a Valid Claim, as defined below, exists, would infringe, induce infringement of, or constitute contributory infringement of such a Valid Claim, and/or (2) which falls within the scope of the disclosures or claims of any patent applications included in the Licensed Patents, and/or (3) which falls within the scope of a pending patent application or patent of any improvement thereto which is made or has been made by BD prior to the end of three years after the First Commercial Sale.

The Royalty Bearing Product at issue here is BD's Q-Syte™ (the Q-Syte), a needle-free connector that helps reduce the risk of accidental needle-stick injuries to healthcare workers. Under the original License Agreement, BD's obligation to pay royalties would end "[a]t the expiration of the last to expire patent under the Licensed Patents having a Valid Claim covering Royalty Bearing Products." (Although BD disputes whether the Q-Syte is a qualifying Royalty Bearing Product under the parties' Licensing Agreement, we need not address this argument because we affirm the district court's grant of summary judgment in BD's favor on other grounds).

In February 2005, the parties amended the License Agreement to adjust the royalties payable to Lynn. As relevant here, this First Amendment stated as follows:

> The royalty amounts set forth in this Exhibit A will be adjusted each Fiscal Year by an amount equal to 50% of the change, if any, during the prior Fiscal Year in the Consumer Price Index — All Urban Consumers promulgated by the U.S. Department of Labor, or any successor index.

In March 2007, Lynn filed a patent application that was published as patent application number 20070225635 (the '635 Application). Two months later, Lynn filed patent application number 11/801,649, which both parties refer to as the '649 Application. The '649 Application was a "continuation-in-part" of the '635 Application and another patent application. For reference, § 201.08 of the Manual of Patent Examining Procedure states that "[a] continuation-in-part is an application filed during the lifetime of an earlier nonprovisional application, repeating some substantial portion or all of the earlier nonprovisional application and adding matter not disclosed in the earlier nonprovisional application."

In February 2008, when both the '635 and the '649 Applications were still pending, the parties amended the License Agreement once again. One of the sections of this Second Amendment provided that, subject to certain exceptions, BD "shall have no further obligation to Dr. Lynn under the Licensed Patents or Technical Information as of August 12, 2019." The Second

Amendment also clarified which patents were "Licensed Patents" under the License Agreement, utilizing the following language:

> For clarity, and not for the purpose of limitation, Licensed Patents shall include all Blunt Cannula Penetration Medical Valve patent applications or patents, filed by BD or Dr. Lynn and Dr. Lynn's interest in such patent applications or patents that are jointly owned with BD that are filed or granted after of [sic] the effective date of this Second Amendment. The parties agree that Licensed Patents shall not include applications and patents which claim swab pouches, swabs and protectors for luer valves, and/or swab pouch related methods for swabbing and protecting luer valves including, without limitation, patent applications nos. 20080039803, 20080038167, and 20070225660 and provisional application 61062976 or subsequently filed applications or patents including foreign counterparts claiming these inventions.

In June 2009, the United States Patent and Trademark Office (the Patent Office) deemed the '635 Application abandoned after Lynn failed to "timely file a proper reply" to the Patent Office's October 2008 Non-Final Rejection letter. No patent ever issued directly from the '635 Application itself, but in July 2013, U.S. Patent No. 8,480,968 (the '968 Patent) issued directly from the '649 Application, which is a continuation-in-part of the '635 Application.

On August 12, 2019, BD stopped making royalty payments to Lynn. Almost a year and a half later, on February 5, 2021, BD statutorily disclaimed three patents to which it had sole ownership, including U.S. Patent No. 7,947,032 (the '032 Patent).

## B.     The proceedings below

In October 2021, Lynn sued BD for breach of contract, breach of the implied duty of good faith and fair dealing, and declaratory relief as to the parties' rights under the License Agreement. He alleged that BD owed him Q-Syte-related royalties until December 7, 2021, and that it had therefore breached the License Agreement by (1) failing to pay royalties between August 12, 2019 and December 7, 2021, and (2) failing to adjust the royalty payments for changes in the Consumer Price Index as required by the License Agreement's First Amendment. Lynn also alleged that BD

4

breached the implied duty of good faith and fair dealing by disclaiming the '032 Patent in February 2021. Although Lynn did not contend that he owned the '032 Patent, he asserted that because the Q-Syte fell within the scope of the '032 Patent, BD's disclaimer of that patent in February 2021 was done so that it could stop paying Q-Syte-related royalties eight months before BD's royalty obligation would otherwise expire on December 7, 2021.

BD moved to dismiss Lynn's complaint, which the district court converted into a motion for summary judgment. After permitting the parties to submit supplemental declarations and simultaneous briefing, the district court granted summary judgment in favor of BD on all claims. The court concluded that the phrase "any patent that issues from [the '635 Application]," as used in the License Agreement's Second Amendment, "unambiguously means only those patents that *directly* issue from an application; it does not cover patents that may issue from continuation-in-part or other related applications." *Lynn v. Becton, Dickinson & Co.*, 661 F. Supp. 3d 742, 747 (S.D. Ohio 2023) (emphasis in original). As a result, the court concluded that BD did not breach the License Agreement because (1) its obligation to pay royalties ended on August 12, 2019 pursuant to Section 2 of the Second Amendment, and (2) Lynn offered "no meaningful evidentiary support for his claim" for Consumer Price Index adjustments. *Id.* at 750. The court further held that it did not need to address the implied-duty claim because that claim related to BD's actions after August 2019, when BD no longer had any obligation to make royalty payments to Lynn. *Id.* at 748 n.6. This timely appeal followed.

## II. ANALYSIS

### A.      Standard of review

We review de novo the district court's decision to grant summary judgment. *Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342, 346 (6th Cir. 2005).

"Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012); *see also* Fed. R. Civ. P. 56(a).

When, as in this case, the grant of summary judgment depends upon the interpretation of disputed contractual terms, our review of the district court's interpretation is also de novo. *Meridian Leasing*, 409 F.3d at 346. This includes the district court's conclusion regarding whether the underlying contract is ambiguous. *Id.* ("[T]he existence of ambiguity is a *de novo* question for this Court.").

**B.      Choice of law and contract interpretation**

The district court had jurisdiction based on the parties' diversity of citizenship, so it applied the substantive law of the state stipulated in the License Agreement—in this case, Ohio. "Under Ohio law, contract interpretation, including a determination as to whether a contract is ambiguous, is a question of law." *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019) (citing *Envision Waste Servs., LLC v. County of Medina*, 83 N.E.3d 270, 275 (Ohio Ct. App. 2017)). Courts must interpret contracts "so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." *Lutz v. Chesapeake Appalachia, L.L.C.*, 71 N.E.3d 1010, 1012 (Ohio 2016) (citation and internal quotation marks omitted).

"[I]f a contract's 'language is unclear, indefinite, and reasonably subject to dual interpretations[,] or is of such doubtful meaning that reasonable minds could disagree as to its meaning,' then it is ambiguous as a matter of law." *In re Fifth Third,* 925 F.3d at 276 (quoting *Cadle v. D'Amico*, 66 N.E.3d 1184, 1188 (Ohio Ct. App. 2016)). "In determining whether contractual language is ambiguous, the contract 'must be construed as a whole,' so as 'to give reasonable effect to every provision in the agreement.'" *Savedoff v. Access Grp., Inc.*, 524 F.3d

754, 763 (6th Cir. 2008) (collecting cases) (applying Ohio law). "Technical terms will be given their technical meaning, unless a different intention is clearly expressed." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997).

**C.     The district court correctly concluded that BD's obligation to pay Lynn royalties ended on August 12, 2019**

The parties dispute whether BD's obligation to pay royalties to Lynn ended on August 12, 2019.   Section 2 of the Second Amendment, which addresses the duration of the License Agreement, states as follows:

> Other than royalties which may be due for any patent that issues from U.S. patent application no. 20070225635, and provided no royalties are due (a) under paragraph 2(b) of Article III or (b) by reason of Article I paragraph 9(3) until the expiration of any patent that issues from U.S. patent application no. 20070225635, BD shall have a completely paid-up, royalty free right and license to subsequently make, have made, use, sell, offer for sale and import Royalty Bearing Product and shall have no further obligation to Dr. Lynn under the Licensed Patents or Technical Information as of August 12, 2019.

As the district court points out, this section establishes that BD's "obligation to pay [Lynn] royalties expired on August 12, 2019, with three exceptions:

> 1.     Royalties due for any patent that 'issues from' [the '635 Application].
> 2.     Royalties due under Article III, paragraph 2(b).
> 3.     Royalties for products [that] fall within Article I, paragraph 9(3), until the expiration of any patent that issues from the '635 Application."

*Lynn*, 661 F. Supp. 3d at 746.

Lynn concedes that neither the first nor the second exceptions are applicable in this case, but he asserts that Section 2 of the License Agreement's Second Amendment "did not cut short BD's obligation to pay royalties through at least December 7, 2021."  More specifically, he argues that the third exception—which states that BD owed royalties for the Q-Syte "until the expiration of any patent that issues from the '635 Application"—applies because the '968 Patent is a "patent

that issues from the '635 Application." Lynn therefore contends that BD owed him royalties for Royalty Bearing Products (including, Lynn asserts, the Q-Syte) until the earlier of (1) the date the '968 Patent expired, or (2) the date the patents incorporating those Royalty Bearing Products expired.

Lynn's argument requires us to decide whether the term "issues from" in the third exception encompasses not only any patent that issues "directly" from the '635 Application itself, but also patents that issue "indirectly" from that Application through its continuations-in-part. Under the latter interpretation, the '968 Patent would have "issued from" the '635 Application because that patent issued from a continuation-in-part of the '635 Application. BD's obligations to pay Lynn royalties based on this "indirectly-issues-from" theory would have ended on December 7, 2021, twenty years after the filing of the patent application that Lynn contends was the first disclosure of the Q-Syte.

BD, in contrast, argues that the term "issues from" refers only to a patent that issues directly from a patent application and does not encompass patents that issue from continuations-in-part of that application. And because no patent ever issued directly from the '635 Application, BD contends the third exception does not apply. BD thus argues that its obligation to pay Lynn royalties pursuant to the License Agreement ended on August 12, 2019.

For the reasons set forth below, we agree with BD that the term "issues from" is unambiguous in the context of the License Agreement and refers only to those patents that issue directly from a patent application itself. The third exception in Section 2 of the License Agreement's Second Amendment therefore did not apply because no patent ever issued directly from the '635 Application. The district court thus correctly concluded that BD had no obligation to pay Lynn royalties after August 12, 2019.

**1.** ***Although other courts have discussed the meaning of the term "issues from" in patent law more generally, those decisions do not establish ambiguity as a matter of law in the context of the License Agreement***

The parties do not dispute that the term "issues from" is a legal term of art in patent law. So like the district court, we begin our analysis by reviewing how other courts have used the term in patent law more generally. Most notably, the Federal Circuit discussed this question in *Cooper Technologies Co. v. Dudas*, 536 F.3d 1330 (Fed. Cir. 2008). *Cooper* addressed whether the Patent Office's interpretation of the term "original application" in § 4608 of the American Inventors Protection Act of 1999 was entitled to *Chevron* deference. *Id.* at 1331–32. In concluding that the term "original application" was ambiguous in that context, the Federal Circuit also discussed the meaning of the term "issues from":

> Second, the phrase "issues from" is itself ambiguous. As the Patent Office correctly points out, this court most commonly refers to a patent as issuing from the final application in the chain—not from a parent application. *See, e.g.*, *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1057 (Fed. Cir. 2005) ("All three patents issued from continuations of a common parent application."); *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1084 (Fed. Cir. 2003) ("Each of these patents issued from continuation-in-part applications that depend, ultimately, from a common parent application."). But this usage is not universal, and this court has sometimes referred to multiple patents as issuing from a single parent. *See, e.g.*, *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1564 (Fed. Cir. 1997) ("The '431 and '133 patents issued from this [parent] application.") We therefore cannot agree with the district court that the "issues from" language compels a reading of "original application" that either includes or excludes continuation applications.

*Id.* at 1340.

Lynn also cites various district-court decisions that have used the term "issues from" in passing, but the crux of his argument is that the term is ambiguous because the Federal Circuit said so in *Cooper*. Under Ohio law and this court's controlling precedents, however, the ambiguity analysis is not so simple.

9

The case of *Wilkerson v. American Family Insurance Co.*, 997 F.3d 666 (6th Cir. 2021), is particularly instructive. At issue in *Wilkerson* was whether the term "actual cash value" was ambiguous in the context of an insurance policy governed by Ohio contract law. *Id.* at 668–69. Like the term "issues from," the term "actual cash value" is a legal term of art. *Id.* at 669. This court in *Wilkerson* recognized that, "[a]lthough many state courts have chosen one of [two] definitions [of the term 'actual cash value'] as their 'background rule,' the Ohio Supreme Court has yet to identify a default definition that parties may contract around." *Id.* at 670 (citation omitted). The *Wilkerson* court concluded that, "[u]ntil the Ohio Supreme Court offers additional guidance, then, 'actual cash value' presumptively could mean either 'fair market value' or 'replacement costs minus depreciation' in Ohio." *Id.*

But even though the term "actual cash value" had two possible meanings (just as the Federal Circuit believes that the term "issues from" does), the *Wilkerson* court was "not at all" required "to assume that the phrase is ambiguous" as used in the specific insurance policy under consideration. *Id.* Rather, "[w]hen a phrase can bear two meanings, Ohio courts expand their horizons by looking at the contract as [a] whole to see if one clear meaning best fits the context." *Id.* (collecting cases); *see also P.I. & I. Motor Express, Inc. v. RLI Ins. Co.*, 40 F.4th 398, 412 (6th Cir. 2022) (where a term "might be ambiguous if read by itself[,] Ohio law would then require us to ask whether one reading of the [term] best fits the contract 'as a whole' before conclusively finding it ambiguous") (citing *Sauer v. Crews*, 18 N.E.3d 410, 413 (Ohio 2014)). After reviewing the insurance policy as a whole, and because "a broader look at [the contract] le[ft] no doubt that it use[d] 'actual cash value' to mean market value," the *Wilkerson* court concluded that the term "actual cash value" was not ambiguous in the context of the specific contract before it. 997 F.3d at 670–71.

As a result, even if we were to agree that the term "issues from" can have dual meanings in patent law more generally, we cannot rely solely on the Federal Circuit's decision in *Cooper* to hold that the term is ambiguous as a matter of law in this specific context. We must instead look to the License Agreement as a whole and, as we did in *Wilkerson*, "see if one clear meaning best fits the context." *Id.* at 670.

### 2. BD's proposed interpretation of the term "issues from" best fits the context of the License Agreement and its Second Amendment

BD argues that several provisions of both the License Agreement and its Second Amendment make sense only if a patent directly "issues from" a patent application and not indirectly from any continuations-in-part. We agree for the following reasons:

#### a. Article I, Section 1 of the License Agreement

The License Agreement expressly states that "Licensed Patents" include "those United States patents and patent applications listed in Appendix A of this Agreement, . . . any continuations, continuations in part, divisions, extensions, substitutions, reissues or reexaminations thereof, and all patents issuing therefrom." If Lynn were correct that the term "issues from" itself already encompasses any patents that issue either directly from a patent application or from any continuations, continuations-in-part, divisions, extensions, substitutions, reissues, or reexaminations of that patent application, then the "continuations, continuations in part, divisions, extensions, substitutions, reissues or reexaminations thereof" language would be redundant.

Lynn's only response is that this was a "belt-and-suspenders" approach that "is irrelevant to and has no bearing on the meaning of 'issues from' as used in the Second Amendment." He makes no effort, however, to point to other parts of the License Agreement or its Second Amendment supporting his "belt-and-suspenders" interpretation, nor does he cite any legal

authority supporting his position. Rather, "[i]n construing a contract, a court . . . must give meaning to every paragraph, clause, phrase and word, omitting nothing as meaningless, or surplusage." *Affiliated FM Ins. Co. v. Owens-Corning Fiberglas Corp.*, 16 F.3d 684, 686 (6th Cir. 1994) (applying Ohio law); *see also P.I. & I.*, 40 F.4th at 409 ("[W]hen an ambiguous contract term can be read in two ways, one of which will render another term 'meaningless' and the other of which will give it 'meaning and purpose,' Ohio courts prefer the latter interpretation.") (collecting cases).

In contrast, BD's argument that a patent "issues from" an application only if it issues directly from that application gives the "continuations-in-part," etc. language meaning because it clarifies that the term "Licensed Patents," as defined by the License Agreement, encompasses both (1) the "patents and patent applications listed in Appendix A" and "all patents issuing therefrom," and (2) any "patents issuing [from]" any continuations-in-part, etc. listed in Appendix A." BD's interpretation of the term "issues from" is therefore the only interpretation that "gives meaning and purpose" to the full text of Article I, Section 1 of the License Agreement. *See P.I. & I.*, 40 F.4th at 409 (cleaned up).

### b. *Section 3.A. of the License Agreement's Second Amendment*

Next, we agree with BD that Section 3.A. of the License Agreement's Second Amendment indicates that the term "issues from" refers only to patents issuing directly from a patent application. Section 3.A. clarifies the definition of "Licensed Patents" as stated in Article I, Section 1 of the License Agreement. It first explains that "[f]or clarity, and not for the purpose of limitation, Licensed Patents shall include" (1) "all Blunt Cannula Penetration Medical Valve patent applications or patents[] filed by BD or Dr. Lynn," and (2) Lynn's "interest in such patent applications or patents [] jointly owned with BD that are filed or granted after [] the effective date

of [the] Second Amendment." The section then states that "Licensed Patents shall not include applications and patents which claim swab pouches, swabs and protectors for luer valves, and/or swab pouch related methods for swabbing and protecting luer valves . . . including, without limitation[,] patent application[] . . . 20080038167 . . . ."

Patent application number 20080038167 is noteworthy because it is the application from which the '968 Patent (the patent at the heart of the dispute between the parties regarding the length of the royalty-payment period) directly issued. Lynn argues that the '968 Patent also "issued from" the '635 Application because it issued from a continuation-in-part of that application, whereas BD contends otherwise because the '968 Patent did not issue directly from the '635 Application itself. Section 3.A. refers specifically to the application from which the '968 Patent directly issued, and it names that application as one which is *not* a "Licensed Patent." The '968 Patent is therefore outside the scope of the License Agreement because (1) the License Agreement's Second Amendment states that "Licensed Patents shall not include . . . patent application[] . . . 20080038167," and (2) Article II of the License Agreement provides that "Dr. Lynn hereby grants to BD an exclusive, worldwide right and license in the Licensed Patents . . . ."

BD correctly points out that, under Lynn's interpretation of the term "issues from," BD would be obligated to pay Lynn royalties until the expiration date of a patent that it explicitly chose not to license. Lynn responds that the phrase "until the expiration of any patent that issues from [the '635 Application]" is a "duration provision," which determines only when the License Agreement ends and is not contingent on whether a patent is a "Licensed Patent." But "[a]mbiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation," *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008), and Lynn provides no explanation for why the parties would intend the duration of the license—and therefore the amount of royalties

13

that BD owes Lynn—to depend on a patent that the License Agreement specifically excludes. Nor does Lynn (1) cite any cases in which the duration of a patent license was determined by patents that were outside the scope of the license, or (2) point to any other language in the License Agreement or its amendments suggesting that the parties intended such a result.

In contrast, BD's interpretation raises no such concerns. The '635 Application claimed a connection system and a valve system testing method. Although Lynn points out that the '635 Application included a drawing disclosing a swab pouch, he does not call into question that generally "patent protection does not extend to subject matter disclosed but not claimed." *Arcelormittal France v. AK Steel Corp.*, 700 F.3d 1314, 1321 (Fed. Cir. 2012); *see also Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014) ("The Patent Act requires that a patent specification 'conclude with one or more claims *particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the] invention*." (alteration in original) (quoting 35 U.S.C. § 112(b))). So a hypothetical patent issuing directly from the '635 Application would not likely claim "swab pouches, swabs and protectors for luer valves," or any other inventions that Section 3.A. explicitly excludes from the scope of the License Agreement. This hypothetical patent—unlike the '968 Patent—would presumably fall within the scope of the term "Licensed Patents," which includes "all Blunt Cannula Penetration Medical Valve patent applications or patents[] filed by BD or Dr. Lynn."

The end of the contract term, under BD's interpretation, would thus be based on the expiration date of a patent that the parties licensed rather than a patent that they specifically agreed to exclude from the License Agreement. This would be consistent with both the original end date of the License Agreement—which was the "expiration of the last to expire patent under the Licensed Patents"—and Ohio's default rule regarding the duration of patent licenses. *See Nilsson*

14

*v. Architron Sys.*, No. 10CA0066-M, 2011 WL 4507579, at *2 (Ohio Ct. App. Sept. 30, 2011) (citing *Dall Motor Parts Co. v. Packard Motor Car Co.*, 178 N.E. 835, 836 (Ohio 1931)) ("[T]he Ohio Supreme Court has indicated that where there is no limitation as to the term of the license on its face, the license continues until the expiration of the patent.").

### c.       *Lack of support for Lynn's interpretation*

Both of the sections discussed above favor BD's interpretation of the term "issues from," whereas Lynn fails to identify any provisions of the License Agreement or its amendments that similarly support his interpretation.  At most, Lynn appears to argue that the phrase "until the expiration of any patent that issues from the ['635 Application]"  implies that multiple patents— including the '968 Patent—could "issue from" the '635 Application because "any patent" refers to the first patent to expire.  Lynn does not cite any legal authority that has used "any" to mean "the first of any," however, and the dictionary that he quotes for the definition of "any" similarly does not list "the first" as a possible meaning or synonym.  This lack of support suggests that Lynn's interpretation of "any" is at best a strained use of the word, and Ohio courts have rejected giving "a strained, unnatural and forced meaning . . . [to] words or phrases."  *Feldkamp v. USAA Ins. Co.*, 743 N.E.2d 405, 409 (Ohio Ct. App. 2000) (quoting *New Amsterdam Casualty Co. v. Johnson*, 110 N.E. 475, 475 (Ohio 1914)).

Neither party contends that any other part of the License Agreement is relevant to the meaning of the term "issues from."  As a result, the relevant provisions all either (1) favor BD's interpretation, or (2) fail to support Lynn's interpretation, which indicates that this is a case in which there is "one clear meaning [that] best fits the context" of the License Agreement.  *See Wilkerson*, 997 F.3d at 670.  As this court recognized in *Wilkerson*, "just because the phrase may

15

be used in two different ways when read in isolation does not mean that all uses of the phrase are reasonably susceptible to both understandings." *Id.* at 672.

The district court therefore did not err in holding that the term "issues from," as used in the License Agreement's Second Amendment, unambiguously refers only to a patent that issues directly from a patent application and not to any patents that issue from continuations or continuations-in-part. And because no patent ever issued directly from the '635 Application, the district court correctly concluded that (1) BD's royalty obligations ended on August 12, 2019 pursuant to Section 2 of the License Agreement's Second Amendment, and (2) BD did not breach the License Agreement when it ceased paying Lynn royalties after that date. For these reasons, we affirm the district court's grant of summary judgment in favor of BD on Lynn's breach-of-contract claim.

**D.      The district court correctly granted summary judgment on Lynn's other claims**

*1.      Implied duty of good faith and fair dealing*

In addition to the breach-of-contract claim, Lynn asserted that BD breached the implied duty of good faith and fair dealing in February 2021 when it statutorily disclaimed the '032 Patent, which BD solely owned. As discussed previously, Lynn contends that BD owed Lynn royalties on an invention—the Q-Syte—that fell within the scope of the '032 Patent. He further claims that BD disclaimed the '032 Patent in order to prematurely end its obligations to Lynn before the alleged December 7, 2021 expiration date of the License Agreement. The district court rejected this argument, holding that "because [BD]'s obligations to make royalty payments ended in August 2019, any actions [it] took after that date did not have a bearing on those obligations." *Lynn*, 661 F. Supp. at 748 n.6.

16

Lynn does not dispute that his claim of an implied duty of good faith and fair dealing arises from events that occurred more than a year after August 12, 2019, nor does he argue that BD had an implied duty of good faith and fair dealing after its royalty obligations ended. Rather, he contends that "[b]ecause BD is not entitled to summary judgment on Dr. Lynn's claim for breach of contract based on its failure to pay post-August 2019 royalties, summary judgment should also be denied as to his claim that BD breached its implied duty of good faith and fair dealing." As discussed previously, however, the district court correctly granted summary judgment on the breach-of-contract claim because no patent directly "issued from" the '635 Application and BD had no obligation to pay royalties after August 12, 2019. We therefore also affirm the district court's grant of summary judgment on Lynn's implied-duty claim.

### 2. *Lynn's royalty-adjustment claim*

Finally, Lynn contends that the district court should not have granted summary judgment on his claim that BD breached Exhibit A, Section 4, of the License Agreement's First Amendment, which required BD to adjust royalty payments annually by 50% of any change in the prior year's Consumer Price Index. We find no merit in Lynn's argument.

Lynn first asserts that the grant of summary judgment violated the notice requirements of Rule 56 of the Federal Rules of Civil Procedure because BD contended in its simultaneous supplemental brief that Lynn provided no evidentiary support for his royalty-adjustment claim. But he does not dispute that BD raised the same argument in its motion-to-dismiss briefing. Nor does he deny that the district court (1) notified both parties of its intent to convert the motion to dismiss into a motion for summary judgment, (2) initially gave both parties 60 days to submit any evidence and supplemental briefing, (3) granted extensions totaling another 60 days, and (4) accepted the sur-reply and supplemental declaration that Lynn filed. The district court

therefore did not err in concluding that "any argument from Plaintiff that he lacked notice that Defendant was challenging one or more of [his] claims is without merit." *Lynn*, 661 F. Supp. 3d at 745.

On the merits, Lynn argues that his unequivocal denial that BD made the required Consumer Price Index adjustments is sufficient to overcome summary judgment. He relies on *Boykin v. Fam. Dollar Stores of Michigan, LLC*, 3 F.4th 832 (6th Cir. 2021), in which this court concluded that the plaintiff's "flat denial was 'specific enough' to [establish a genuine factual dispute]" because "[the defendant] does not identify what else he should have said," and "[t]he summary judgment standard does not require him to prove a negative." *Id.* at 842 (citations and internal quotation marks omitted). But "[c]onclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment," *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009), and this court has held that that such statements are not enough to overcome summary judgment in the context of disputes over monetary payments. *See Pierce v. Ocwen Loan Servicing, LLC*, No. 20-6057, 2021 WL 4129526, at *2 (6th Cir. Sept. 10, 2021) (affirming the grant of summary judgment where the plaintiffs provided only an "unsupported, conclusory affidavit" that did "not identify specific discrepancies between the amounts of escrow items due and the escrow charged"); *Berry v. USPS*, No. 22-3577, 2023 WL 3035371, at *3 (6th Cir. Apr. 21, 2023) (holding that the plaintiff's statement that "she 'was paid less money' for October 10[,] but did not specify an amount that she believed she was entitled to," did not establish a genuine factual dispute).

Furthermore, even if Lynn's unequivocal denial established a genuine dispute of material fact, the License Agreement's "audit provision" bars his royalty-adjustment claim. Article XI of the License Agreement states that Lynn "shall have the right for a period of two years after

receiving any statement from BD" to hire an accountant "for the purpose of verifying the payments made under this Agreement." The Article further provides that "The failure of Dr. Lynn to request verification of any payment statement during said two-year period shall be considered acceptance of the accuracy of such statement," and payment statements "shall be deemed to be true and correct unless objected to and audited." Neither party contends that the First or Second Amendments altered these provisions.

Lynn does not assert that he ever objected to or audited any of the payments that he now claims do not reflect a Consumer Price Index adjustment. Rather, he argues that these provisions concern only the accuracy of the payments and are irrelevant to his royalty-adjustment claim. But the provision expressly states that the payment statements "shall be deemed to be true and correct unless objected to and audited" within the two-year period, and Lynn's interpretation would render the words "true and correct" meaningless. Because we must "give meaning to every paragraph, clause, phrase and word, omitting nothing as meaningless, or surplusage," *Affiliated FM Ins. Co. v. Owens-Corning Fiberglas Corp.*, 16 F.3d 684, 686 (6th Cir. 1994) (applying Ohio law), we conclude that Lynn's claim for adjustments based on the Consumer Price Index is barred by the License Agreement's audit provision. *See also Tatis v. U.S. Bancorp*, 473 F.3d 672, 676 (6th Cir. 2007) (holding that a contract provision requiring the plaintiff to report any forgeries within 30 days "precluded [the plaintiff, who did not report within that time,] from asserting a claim . . . for those forged items"). We therefore affirm the district court's grant of summary judgment on Lynn's royalty-adjustment claim.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.